AUSTIN BALDWIN AND OTHERS, RESPONDENTS, *v.* THE LIVER-POOL AND GREAT WESTERN STEAM COMPANY (LIM-ITED), APPELLANT.

*Payment, under protest, of charges made by a common carrier — contract of carrier — Misrepresentation as to nature of freight — Fraudulent concealment.*

The plaintiffs, who are forwarders and common carriers, received in New York from the Atlantic and Great Western Railroad Company two boxes addressed, and to be delivered, to a banker in Liverpool, and, upon inquiry, were informed that they contained incomplete bonds of no commercial value beyond that of the paper, printing, etc. The plaintiffs delivered them to the defendant with-

out any representations on their part, or any inquiries on the part of the defendant as to their contents. The form and appearance of the boxes were not such as to mislead the defendant, and there was no deception practiced. Upon the arrival of the boxes at Liverpool, it was found that they contained $2,000,000 worth of bonds, executed and ready for delivery. The defendant refused to deliver the boxes until an additional charge of £200 sterling was paid for their transportation. In an action to recover this amount, *held*, that, as no artifice was resorted to, and no representation made to deceive the agents of the defendant, it was bound to inquire of the shippers, if it desired to ascertain the contents of the boxes; and having failed so to do, it must abide by its contract as to the freight charges to be received thereon.

APPEAL from a judgment in favor of plaintiff, entered on the report of a referee.

*George C. Holt*, for the appellant.

*Charles M. Da Costa* and *William H. Hoes*, for the respondents.

DANIELS, J.:

The plaintiffs prosecuted this action for the recovery of additional freight, amounting to the sum of £200 sterling, paid upon the transportation and delivery of two boxes of undelivered bonds of the Atlantic and Great Western Railway Company. The bonds were taken on board the defendant's steamer, Colorado, at the city of New York, and carried by it to Liverpool. There, after the delivery of one of the boxes, the other was opened and discovered to contain bonds, completed in form, of the railway company. The defendant then detained it until the additional freight claimed was paid, and payment was made of it by the agents of the plaintiffs under protest, for the sole purpose of procuring possession of the box and its contents. That, as the law stands, was sufficient to sustain this action, in case the additional freight was illegally exacted. (*Harmony* v. *Bingham*, 2 Kern., 99.)

The boxes containing the bonds were delivered by the railway company to the plaintiffs as carriers, and represented to be simply printed sheets of incomplete bonds, that were of no commercial value, whatsoever, beyond the value of the paper, stamps and printing. And if they were lost, the cost of their reproduction would be in the neighborhood of the sum named as their value, which one

witness thought was about $5,000. Upon that understanding the plaintiffs received them, and afterwards delivered them to the defendant. But there was no evidence showing that any representations, as to the contents of the boxes, were made to the agents of the defendant. They were examined upon the subject, but neither of them had any recollection of what had transpired when the boxes were received. And they did not appear to have been packed in such a manner as to create any false impression as to their contents. The receipts taken for the boxes were not produced, but were affirmed by the plaintiffs to have been lost. The defendant produced a stub, written in its receipt-book, stating that it had received from the plaintiffs five packages of samples, but as the witness did not himself remember what had transpired, he very obviously could not testify that those boxes were addressed in that manner, or represented as containing only samples, when in fact the contents were undelivered negotiable railway bonds. The stipulation read in evidence, and also one of the witnesses sworn on behalf of the defendant, described the address as it had been placed upon the boxes, without any reference to the circumstance that either had been designated as containing samples; besides that there were not five of them in number as the stub stated, but only two, and they were addressed to a well-known firm of bankers in London, whose business would not be supposed to extend to articles understood to be represented by the term samples. It was not probable that the boxes had been marked in that manner, or that they were the same packages as were mentioned on the stub. If they had been, the fact would most likely have attracted the observation of the plaintiff, whose attention was directed to them when they were received by his firm. He swore that they were addressed to bankers, and for that reason he was induced to inquire concerning the contents of the boxes. And the impropriety would have been at once apparent to him if they had been marked samples, when he was told they were bonds.

The referee, from all the evidence before him, found that the form and appearance of the boxes were not such as to mislead the defendant, that no deception was practiced, and no misrepresentations were made by the plaintiffs concerning the character and contents of the boxes. The preponderance of the evidence on these

circumstances was decidedly with the plaintiffs, and, accordingly, the conclusions drawn from it by the referee must be considered final.

The evidence also failed to show that any inquiry was made by either of the defendant's agents, as to the nature of the contents of the boxes. They did, in fact, contain $2,000,000 in amount of first mortgage bonds, which were in transit to the agents of the railway company at London, to be there delivered in exchange to the holders of preceding bonds for like amounts, and which had been secured in a similar manner and were designed to be returned. They were executed ready for delivery, but by a regulation of the London Stock Exchange, could not there be negotiated until they were counter-signed by the agents who were to receive them and make the exchange. This restriction seems to have only prevailed there, and for that reason would not have prevented their negotiation elsewhere by the mere delivery, even of a fraudulent holder. But that circumstance was not sufficient to enable the defendant to maintain its defense against the present action; for, as long as no artifice was resorted to, and no representation made to deceive the agents of the defendant, it was bound to inquire of the shippers, if any desire existed to ascertain the contents of the boxes, in order to determine the compensation which should be charged for their carriage and delivery; and when that has not been done, the carrier must be governed by the contract he may have made. The rule upon the subject has been declared in a very recent case, in terms excluding the validity of the claim insisted upon by the defendant in this instance.

By this rule "where there is no special contract limiting the common-law liability of the carrier, nor any notice so specially brought home to the knowledge of the shipper as to have that effect, the shipper is not bound to disclose the value of the goods, unless he is asked therefor by the carrier, but the carrier has a right to make inquiry and have a true answer, and if he is deceived by a false answer given he will not be responsible for any loss. If, however, the carrier makes no inquiry, and no artifice is used to mislead him, he is responsible for the loss, however great may be the value." (Per Folger, J., in *Magnin* v. *Dinsmore*, 62 N. Y., 35, 40.) And the same rule was declared to be the law upon this subject in the earlier

case of *Walker* v. *Jackson* (10 M. & W., 161, 168; Angell on Carriers, § 264.)

It was by no fraud or deception that the defendant was induced to contract for the carriage and delivery of the bonds as it did, for the compensation of six dollars, and that was all that was paid. That was the agreement voluntarily made by it, and it could not afterwards insist upon a larger compensation, because it discovered, after the service contracted for had been performed, the existence of a fact which might, when the packages were presented, have justified the exaction of a much larger sum. The agreement was made for a consideration deemed adequate at the time, and as the defendant was not induced to enter into it by any deception or other improper means, it was bound to perform it according to the terms in which it had been made.

It has been insisted that it was a fraud upon the defendant to place property of this description in its custody for carriage, in the manner these bonds appear to have been packed. But there was nothing in that circumstance from which it could be held that the conduct of the shipper was for that reason fraudulent. They were undelivered securities, having, by reason of that circumstance, no great value in the defendant's custody, nor in that of any other person, until they should be negotiated. And the fact that, in other instances, similar instruments were sent forward in valises, does not fortify this position of the defendant. For that was not done for the success of any fraudulent design, but, as the witness testified, simply on account of the suddenness of the occasion, and to be in a handy shape to place on board the ship. The bonds seem to have been regarded by the railway company as of no greater value, than the expense of reproducing them in case they had been lost or destroyed, and its conduct cannot be held to be fraudulent, even if it erroneously acted in good faith upon that belief. But this was not an inaccurate view to be taken of their value as they were held by the plaintiff or the defendant. And if they had been stolen and fraudulently negotiated by the thief, it is not very probable that the defendant could have been rendered liable for their enhanced value resulting from those circumstances; for that would be produced by an act not necessarily caused by its own omission of care. (*Ryan* v. *N. Y. Central R. R. Co.*, 35 N. Y., 210.)

But however that may be, and it is not necessary to decide it now, as no fraud was practiced upon the defendant, and it made no inquiry concerning the quality or value of the contents of the boxes, even the existence of so large a measure of liability would not relieve it from the performance of its contract, or entitle it to demand the payment of a consideration not required by the agreement.

The witness was not improperly allowed to state why the bonds were not fully executed. The evidence was proper for the completion of the statement elicited by the defendant's counsel. He had stated, on that examination, that the bonds were not fully executed; and he was afterwards only allowed to add in what respect their execution was defective. There could be no impropriety in permitting that to be done. And besides that, the evidence given was more essential to the support of the defendants' position than to the advancement of the plaintiffs' case. For it showed that no imperfection existed in the execution of the bonds, but that they were merely defective for negotiation in the London market, because of want of compliance with a regulation of one of its local boards.

The evidence was harmless to the defendant, owing to the manner in which this subject had been left by it. As no error can be held to have intervened in the trial or disposition which the referee made of the case, the judgment appealed from should be affirmed.

Davis, P. J., and Brady, J., concurred.

Judgment affirmed.